The next case we have for oral argument is 24-2027, Alcala v. Ortega. Ms. Saez, when you're ready. We are before you today following the District Court's granting of qualified immunity to Deputy Ortega, who shot and killed an unarmed Diego Alcala seconds after he ordered Alcala to stop, and Alcala had stopped. Plaintiffs asked this court to reverse and allow a jury to decide critical factual conclusions regarding that death. The nature of the briefing before the court well demonstrates that this case is highly materially and well disputed, and the defendant's video evidence does not blatantly contradict plaintiff's case. In fact, a jury could reasonably and easily conclude that the video evidence demonstrates that Ortega killed an unarmed, surrendered Alcala, and that he was objectively unreasonable in so doing. A jury could also— Did you say surrendered Alcala? Yes. But what's the evidence that he was surrendering? Didn't the officer order him to get down? He gave him conflicting commands. He told him to raise his arms, and he also told him to get on the ground. Did he do either of those? Not in the six seconds he had occasion to do. So he had both hands on his knees, and he was resting and winded, but it was six seconds before, and arguably, if the court were to accept defendant's version of the facts, which is that Deputy Ortega shot because of a movement with his hand already in the air, we don't know. I mean, he could have been shot while attempting to comply with the order to raise his hands. Can't we tell from the video, there are nine shots, and you watch the real speed when you can count them out, one, two, three, all the way to nine. And then you do the slower one, and you know where that first sound was from the other one. And by my look, and you can tell me otherwise, and I'm not swearing to anything, by my look, the first shot comes after Mr. Alcala has actually turned his full body and is extending an arm with the finger out, the deputy described as pointing, it looks like a gun to me, pointing. In other words, if he would have had a gun, the officer would have been shot before he ever got a shot off. I think this is interesting and calls into question, right, Scott versus Harris. I very much see something different, even in the slow motion version. Do you hear something different as far as when the gunshots begin? I hear the gunshots beginning with a slight movement with his hand by his side. And this, and in the still frames that the defendants rely on, it shows that the movement with the hand in the air is 14 frames, I think. You can see the hand in the screen fairly, but what you're referencing, what may look like a gun drawn, is 14 frames after they even indicate there's a gunshot. Well, the first sign that he has been struck as he reels back is after that's all happened. Otherwise it's a normal motion, there's nothing, the arm comes up, the finger is pointed, and then after that, you see him roil back. I don't believe that's the case when you look at the video, I don't believe it's the case when you look at the slow motion version, I don't think it's the case when you look at the stills that they extracted from the video. Okay, I'll take another look. Yeah, and the real-time video, the only other living witness from this event watched it and agreed with us as well, or agreed with how Plaintiff is interpreting the video. And to me, this motion where he's being spawned is him reacting to the gunshots, and the slow motion, at most, what I see is that he's slightly standing when you hear the gunshot. It's a little, are you watching the simultaneous videos, or just the blown-up slow motion? Watched every one in the record, and more than once. Yeah, we just see it differently, which I think is an interesting question. Do you agree with the, there are nine shots? Um, I don't remember. Isn't that undisputed? I believe so. That there were nine shots? Yeah. Okay. And so, we can look at the video, count the shots, and make up our mind, right? Yeah, but the most significant thing is when did he shoot first? And that would be shot number one that we hear. Right. And I do, both the frames they've extracted and the slow motion video, I believe, shows that the shots were before the movement they have consistently relied on for justifying killing Mr. Alcala. Is there any question about the synchrony between the video and the audio? Does everyone agree that they are synced? Was it ever challenged? I, we have not challenged that, and we haven't challenged it because we believe it shows that he was shot before the movement he made that they're relying on, is in part why we haven't challenged that. When you say the other living witness, are you talking about the officer who drove up? Correct. So this was occurring? Okay. Yeah, Officer Hayes. So he drives, so those are the two videos that exist are from dash cameras. One from Officer Hayes's vehicle and one from Officer Alcala's, I mean Ortega's, sorry. With Officer Hayes, just so I'm sure of what you're saying, are you saying that he watched these videos that have been produced to us and agreed with your interpretation? Are you saying he drove up and what he thought he saw was such and such? He watched the real time video in his deposition and after watching that agreed that what he had thought he saw and seen was mistaken. But he didn't see the slower version? He has not seen the slow motion video. But yeah, to direct you to the frames, again, let me find the actual numbers because the movement that they rely on in those frames and what you're talking about, they even identify as after the shot. It's in the briefs, isn't it? Yes. Okay. Let me ask you this. Is your position that the deputy violated the Fourth Amendment because he shot knowing that Mr. Alcala didn't, hadn't moved or that he mistakenly thought that he was moving and shot him? I think a reasonable jury could conclude either way, given his inconsistent testimony about why he shot and the fact that the physical evidence doesn't support that either there was a gun or that there was a gunshot. Well, let's take the second one, which is the jury says he doesn't look like a cold-blooded killer. He certainly didn't jump out of the car and immediately shoot him. So we agree with your interpretation of the video and he shot early and it was mistaken. It was tense. And of course, the law accommodates for tenseness and immediacy and so forth. And it wasn't a knife we're talking about that he feared it was a gun. And the jury says he probably jumped the gun by just a fraction of a second, fearing for his life. That's not a Fourth Amendment violation, isn't it? Well, an unreasonable mistake would be. And would it be unreasonable in that situation to, by a millisecond, jump the gun when you're concerned that the other person has a firearm and will shoot you, who has not obeyed your commands? Because it would be unreasonable if a caller was moving to a... he's being ordered to move. So the natural consequence of an order to move would be that everything that people are complaining about, which would be he would pass his waistband, he would put an arm in the air. That's the natural consequence of telling somebody to put their hands in the air, number one, so that would be unreasonable. They'd raise their hands, which he didn't do. And the posture. He sets up at an angle to the officer. He's not facing him. He sets up an angle. You can see his right elbow bent and therefore the hand is near his waistband. And that's what causes the concern, right? If he were facing the officer so the officer could see his hands, it would be a totally different thing. And that's why the officer says that he's moving to the left, is he's trying to get a look at Mr. Alcala's right hand. We don't have a view of what the officer actually saw. Our view of what the officer actually saw was not captured, because despite state law he wasn't wearing a lapel camera. So he claims to have been about four feet to the left, which is, again, just his speculation, supposition, and estimation. Because we don't know. And so we don't know exactly what he saw, which is why, if there's any, I don't believe that the video blatantly contradicts Plaintiff's case. And all of his statements then about when and why he shot and what he saw when he shot, which also includes from he believed he was being shot at and heard a pop, which is objectively unreasonable given that didn't actually happen. And then he also testified in his deposition that he shot when his arms were raised and clearly empty. And anything about this situation that was rapidly evolving and anything about the situation in that moment was his issue. He's giving conflicting, confusing orders that can't possibly be complied with. He can't do both. What if you're wrong about the first gunshot? If we view the video and we say, we disagree with your interpretation of that, the shot actually came after he began to turn, then no Fourth Amendment violation? No. Because, I mean, beginning to turn could still be consistent with putting his arms up. I'm talking about the turn that was made on this video, which is not a... This, where the arm is up? I can raise my arms without turning and it's a quick turn toward the officer. And don't forget that arm and the hand. That is not a putting your hands in the air gesture. I wouldn't think. Your Honor, I may have neglected to reserve time for rebuttal and I would like to reserve my remains. Well, you're being asked questions, so you need to... Sorry? Often, lawyers will ask for rebuttal time to be reserved and we keep asking questions that we haven't reserved time for. So let's pursue this questioning. Okay. But you've answered my question, so I don't want to drain you any further. Well, I have some questions. Okay. Okay. So, did I understand you correctly to say that the officer said he shot Mr. Alcala when Mr. Alcala's hands were both up? Were both up and empty and that he could see that as one version of his testimony, yes. Yep. That he says that's his first shot was at that time.  Yes. In his deposition, when asked what Mr. Alcala was doing when he was shot, he says he could see his right arm up, he could see his left hand, and that he could discern that they were both empty. That is his testimony. Was any weapon found at the scene? He was unarmed. Yeah, no. There was no weapon at the scene. I was just looking at the video again this morning, and it sure looked like there was something in his hand. Do we have any idea whether he had anything in his hand? He had nothing in his hand. Okay. Thank you. You're welcome. Thank you. I'm good. Thank you. You're honest. Ms. Grant? Good morning, Your Honor. May it please the Court. Deputy Ortega faced a situation that any officer would have reasonably perceived as a dire mortal threat, and that's what's being washed over today. Plaintiff does not dispute that the actions that were reported through dispatch actually happened or that that information was actually dispersed by dispatch through the radio. What Plaintiff relies on is speculation based on disputes that don't actually create a genuine dispute. So that means they're speculative, and again, as we heard today, they're based on a weighing of credibility that is just simply inappropriate on summary judgment. Well, let me pursue a little bit about the notion that he had not responded, that Mr. Alcala had not responded to police orders. The description given by Ms. Ives was that he'd been running, you can see that, he's out of breath. He's, you know, when you're out of breath, you'll lean over to catch your breath. And why would an officer not think that that was a reasonable reason why he had not responded at that time? She said there were like six seconds between the first order and the shot. Is that, was it unreasonable for the officer to expect the fellow who'd just been running and seemed to be out of breath or whatever, that you can give him some leeway there when he's going to get down or raise his hands or whatever he should do in response to the officer's orders? Well, it would have been, perhaps we could talk about whether it was reasonable or not, but the point is that it wasn't Deputy Ortega who made the decision to move. It was Mr. Alcala's move that prompted the shooting. So there may well have been additional commands, but that opportunity was cut short when Mr. Alcala made that sudden move, bringing his hand from his waistband up towards Deputy Ortega. Were both hands going up at that time? No, I believe there may have been some slight movement in his left hand, but it wasn't consistent with putting hands up or anything like that, which of course the court in the state of Val Verde specifically said, when you cannot see a gun, an officer can do little more than command the subject to raise their hands and get on the ground. And that's exactly what Deputy Ortega did in this case. But considering the totality of the circumstances, as we must in these circumstances, in addition to the specific moment that Deputy Ortega fired, we're dealing with a circumstance where there's a motor vehicle accident, and for reasons unknown, a subject pulls a rifle out of his vehicle, points the rifle at several innocent bystanders, and then proceeds to attempt to hijack, by force, multiple vehicles. And then by the time Deputy Ortega enters the picture as he makes his way south on Main, he encounters somebody there on scene who steps into the roadway on Main as we can hear people shouting in the distance. And this man says some things and points him in the direction, giving him a description of what he was wearing. So at this point, Deputy Ortega knows that there's a subject who is armed and dangerous, and he has further confirmation of what was heard through dispatch from somebody there on scene. Pause there, because what matters is what the officer knew, right? So these dispatch reports don't matter unless the officer read them or heard them, correct? Correct. And the reason you say the deputy knew about him, Mr. Alcala's having a firearm, is because he went to the scene of the accident. And then on the video, you can see a man come up looking somewhat stressed, and points and talks to him. And my understanding is that that man tells him about the gun, and that he can hear it from people in the background talking about a gun. Is that solid on the record, that we can say deputy knew that a gun had at least been involved? Yes. And, you know, because we know this because of the consistency in the actual account. The only difference is the source of where Deputy Ortega identified he got this information. But what is clear is that it was available to him through radio, or through that other gentleman who stepped into the roadway. And the deputy says, that gentleman told me that? He says in his officer-involved interview, he does. And that can be found at page 185 of the appendix. Okay. What happened to the gun? Does anyone have any idea what happened to the gun, if he had one? Yes. So, we learned subsequently that the gun was replaced back into the vehicle. Mr. Oncala replaced the gun back into the vehicle before he left the scene. And that is in the dispatch log, and it's also in the radio recordings. But what's significant about that is there... I'm sorry. I just coughed. ...is that there are multiple subsequent reports reporting a 1080, which is the law enforcement code for a gun, without reference to whether it's a long gun or a short gun. And certainly somebody who brandishes a gun to multiple people on scene, it's very reasonable to presume that it might be armed. And of course, as the district court cited in the United States v. Briggs case, the waistband area is a place where felons often will keep their weapons. So there's, under these highly tense, rapidly evolving circumstances in which multiple people were threatened recklessly for reasons unknown, it was reasonable for Deputy Ortega to presume, as he did, that Mr. Oncala might be armed with some other firearm. And of course, what Deputy Ortega knew at that point, he did not hear about all of the other previous attempts to carjack other people. What he knew is based on what he heard and what he remembered was that there was a subject who had pointed a gun at several people, and that's reported several times in both the radio recordings and Plaintiff's Exhibit 4, as well as the catalog. And so even if we were with the circumstance where the last report indicated that the shot could have been replaced in a car, that still doesn't resolve the likely threat that this person might be armed with another gun, because they've already demonstrated that they're willing to threaten lethal force. And then once Deputy Ortega actually makes contact with the subject, he continues running and then actually attempts to pull an ambulance driver out of the vehicle, which is further confirmation that this subject is willing to use force and is dangerous. And so with all of these inferences, both direct and indirect, Deputy Ortega knew he was in a very dire situation that could quickly turn into an active shooter situation had he not stopped Mr. Oncala right there. And of course, he didn't even get the opportunity to make that decision because Mr. Oncala made it for him when he drew his hand in a motion that is remarkably similar to the drawing and pointing of a gun. This case meets and exceeds the conduct that was in Estate of Taylor v. Salt Lake City if we consider that that case was only on the second grand factor, whereas here we have very severe crimes, some of which were witnessed directly by Deputy Ortega. Then we followed the Estate of Larson factors, the distance, no cover, there were clear commands that were issued, but to the extent that one might argue he couldn't understand, Mr. Oncala understood the first command to stop, and at that point he appreciated that Deputy Ortega was indeed law enforcement. Of course, they were in broad daylight, he was wearing his uniform and standing next to his marked unit. So there's really no question about what Mr. Oncala's manifest intentions were at that point as far as Deputy Ortega could perceive them. They were hostile and there were people nearby, of course they were close to the scene, so it was imperative that Deputy Ortega stop him at that point. And if the circumstances were different, I would further say that if he had made that decision, even under those circumstances, Deputy Ortega could have probably shot him at that point to prevent any further potential injury or serious injury or death to other people that were in the vicinity and certainly up his range. The fact that he was fleeing is a factor that can partially at least justify force, but he wasn't fleeing when he was shot. I think you can say, well if he fled we could shoot him, but he wasn't fleeing, so we can't shoot him then. Well, there's an interesting quote in the Estate of Alberti case where the court says that when a subject reasonably appears as if they're about to shoot an officer, certainly they're reasonably resisting arrest. And of course that's not directly analogous to fleeing, but the point is that the resistance he was not complying, he wasn't even seized at that point because he's not listening to these commands after demonstrating that he at least understood the very first command. And then of course he leaves his hand in a position such that Deputy Ortega cannot determine whether he's armed or not, and that's exactly why, as plaintiff mentioned, he moved to the left to try to verify, to see what was going on with that other hand. He simply couldn't do it, and maybe he could have if he'd been given more time, but Mr. O'Connell made that sudden move, and there's no mistaking it. Plaintiff describes the hand going up like this, but it is very clearly like this, and it happens in a fraction of a second, such that we need the assistance of sync video. And so testimony from an officer who did not actually witness the shooting after the fact is really irrelevant in the end, especially when, again, in the state of Alberta case, this court said that when there is unmistakable video that blatantly contradicts testimony, that overrides the testimony just as it does in this case. Explain that to me, that blatantly contradicted, because it comes out of Scott, but a different setting where the plaintiff won, and the court found a genuine issue of material fact on whether the driving was endangering others. This is the flip, which is the plaintiff loses, and the court finds no genuine issue of material fact. When you say blatantly contradicted, who uses blatantly? Is it the plaintiff's, the appellant's version here, or burden here, to show that the video blatantly contradicts what the district court ruled, or is it your burden to show something that blatantly contradicted their position? Oh, that's an interesting question. I would say that because the summary judgment burden is on the non-moving, it is probably on the defendant to prove. But certainly I think that bears itself out in this case, based on the video. Plaintiff raises these arguments about frames, but that wasn't preserved. That was raised for the first time in the reply, and in the In Re Syngenta case, when you raise an issue in the appellate brief in the reply for the first time, you've waived the issue. But more than that, no matter what frame you're pointing to, and of course, when the deputy or taker raised the issue below, he was referring to when the hand move was seen. And on appeal, we're referring to the first move. So naturally, we're going to have different numbered frames that we're referencing here. But the point is that the hand move and any move clearly precedes the gunshot. And it is really, especially the still frames taken from Officer Hayes' video, shows exactly the trajectory of the move, while Deputy Ortega's slowed video camera with the numbered frames tells you the actual sequence of events. And really, with those two videos alone is sufficient. But the other videos, the synced video, it's not quite accurate. But that, of course, entails an expert having to go in and sync it, but there's room for  But when you look at the objective video evidence, there's just no doubt about the sequence of what happened and the nature of the move as it happened. So you're unsure whether Blatantly Contradicted has a place in this case, and if it does have a place in this case, who the onus is on? Yeah, I would say that I don't have that answer for certain, but I would presume that it would be on the defendant in this case. And I think that that is something that Deputy Ortega has been able to demonstrate. And the State of Alberta case specifically referred to synced video, and of course the description of what exactly that synced video was, whether there was the aerial camera that was at issue in that case, we don't really know from the decision. But what we do know is that we have objective evidence with numbered frames, and it clearly contradicts any other interpretation that would suggest that Mr. Alcala was surrendering. He didn't say anything to that effect. He made no motions that Deputy Ortega could have reasonably perceived as a surrender. What if the first gunshot comes before he begins to turn? Well, I suppose that then we would be thinking about different case law in terms of whether I believe it was nine seconds from when he started issuing the commands was a sufficient amount of time to comply. And I would say even under those circumstances, that's what we're dealing with. If we look to the Tenorio case, the subject in that case holding knives loosely by his side took three steps and was shot within a matter of about, I believe it was two seconds. Are you saying that it was okay to shoot if he never moved? If he waited a full minute, then go ahead and shoot? If he's not complying, I mean, I would have to inject hypothetical facts to really fully answer that question. But if he had maintained his position for a minute, I would think then it's possible. But I would probably need to know more to really fully answer it. But, of course, the main concern that Deputy Ortega had at that moment... I know you're out of time. Sorry. I have one quick question because you stated something that was contrary to what opposing counsel said. You said there were nine seconds between when he was ordered to raise his hands and lie down? Yes. And when he was shot? Correct. And opposing counsel said six seconds. Are you measuring from different starting points? Do you know what the difference is? No. I think we're differing in terms of our timing. But I believe it was nine seconds, not six seconds. Thank you. Give her three minutes. A few points. To begin with, so counsel, defendant's counsel came up here and talked about my client's attempting to hijack five vehicles. He was unarmed. He was running. No officer had told him to stop before Ortega told him to stop. When Ortega told him to stop, he stopped. And there are instances where this court has had far more serious allegations against a criminal suspect where what actually matters is does the officer have the right to shoot and kill somebody in that moment? Well, if there were five or 10 or however many vehicles, it would be immaterial, wouldn't it? Correct. Because he didn't know it. The officer has to know it. The officer has to know it. And he knew something about the ambulance. Potentially. When he made the statement about the ambulance, it was after he'd had counsel and a week had  The video shows that. By the time he comes around the corner and the camera sees the scene, and all he had to do is turn his head and he would have seen it before that point.  Mr. Ocala is running down the street. He's still within the shadow. He's still within the shadow of the ambulance. And then the ambulance driver is gesturing and pointing and so forth. So there's that. Right. But in any event, the significance. So when you're talking about seeing the video with his twist, that is the video in which you can't hear noise. And you can't pinpoint where the gunshot is, except for by virtue of their frames. And again, is this appropriate? Is this appropriate for a court under Scott versus Harris? Are we having a jury discussion right now? Potentially. But in any event, those frames and why she just stood up here and said, oh, they waived that argument is because the frames and their own evidence demonstrates the shot comes before the movement that they say justifies killing this man. And just based on that, we should get an opportunity to present that with a jury. She also conceded experts would have a lot to say about these videos and what happened and when and how to sync them. That's what we want the opportunity to do with a jury. Well, it's summary judgment. You can't say we're going to put on evidence later. If you have evidence to rebut the motion for summary judgment, you can't respond by saying, well, lots of experts might help us on that. We have rebutted. We have rebutted the evidence. It was defendant's counsel that said she would use an expert.  Thank you so much, Your Honors. I respectfully ask that you reverse the district court and remand. Thank you, counsel. Case is submitted. Counselor excused. We're going to take a brief recess.